# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51211-4-II |
| Respondent, | |
| v. | |
| CHARLES CARROLL HARTZELL IV, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Charles Hartzell appeals his convictions for attempting to elude a pursuing police vehicle, hit and run property damage, possession of heroin with intent to deliver, possession of methamphetamine, and two counts of unlawful possession of a payment instrument.[1] Hartzell alleges that the police conducted unlawful impound and inventory searches and seizures. We disagree. However, because the prosecutor committed prejudicial misconduct in her cross-examination of a defense witness, we reverse Hartzell's conviction for possession of heroin with intent to distribute.[2] We affirm his other convictions and remand to the superior court for further proceedings.

---

[1] Hartzell raises no issues as to the first two convictions except as they relate to legal financial obligations.

[2] This remedy is the relief requested by Hartzell for this violation.

FACTS

I.    INCIDENT

On February 6, 2017, at about 10:00 p.m., Jefferson County Deputy Brian Anderson saw Hartzell in a vehicle at a gas station. Anderson knew that a valid arrest warrant existed for Hartzell. When Hartzell drove away from the gas station, Anderson pulled him over, approached, and told him he was under arrest.

Hartzell immediately accelerated and fled in his vehicle. Anderson returned to his vehicle and gave chase with his lights and sirens activated. Hartzell exceeded 100 miles per hour. Eventually, Hartzell lost control of his vehicle and hit a tree on private property. He then exited his vehicle and fled on foot. Anderson tried to pursue Hartzell, but lost sight of him and called for back-up.

Police found Hartzell about thirty minutes later and took him to the hospital for injuries he had sustained in the crash. After the hospital cleared Hartzell, Anderson took him to jail. Anderson then returned to the scene of the crash.

II.    IMPOUND AND INVENTORY SEARCH

While other deputies, including Anderson, searched for Hartzell, Deputy Brian Peterson secured the crashed vehicle. Hartzell's collision had knocked the tree out of the ground and left the car stuck on the roots. Peterson requested a tow of Hartzell's vehicle, but the tow truck driver refused to move the car until the tree was "dismantled." 1 Report of Proceedings (RP) at 53. Peterson hired a contractor who came at some point after midnight and cut down the tree. A tow truck driver then towed the vehicle away from the stump and left it nearby so Anderson and Peterson could perform an inventory search, which they did.

The car was not drivable. Peterson testified that he intended to impound the car because it was "part of the crime scene" and they couldn't leave it on private property. 1 RP at 54. Anderson said they impounded it because "it was involved in a pursuit and it was on somebody's property, and it was not drivable to have it removed." 1 RP at 16. The deputies did not consider any alternatives to impounding it.

Peterson began filling out an inventory search form as Anderson searched the vehicle. Anderson entered through the driver's side door, picked up a backpack from the floor in front of the passenger seat, and placed it on the driver's seat. He observed that all the zippers were open. Anderson "might have kneeled on [the backpack] while conducting his search" and "admitted that if he had been kneeling on the backpack, this would have manipulated it." Clerk's Papers (CP) at 267.

Peterson observed a baggie containing a white crystalline substance in one of the backpack pouches and drew Anderson's attention to it. After observing the substance, neither deputy touched the backpack or baggie. They determined they would need a warrant to continue searching. They left the backpack on the seat, shut the car door, and had the tow company transport the car to the impound lot. Their inventory search lasted less than a minute.

The inventory form Peterson filled out listed, "Misc clothes/shoes" and "Pictures" as the only items. CP at 276. The deputies "admitted under oath that [Jefferson County Sheriff's Office] policies with respect to inventory searches were not followed" because they never created a detailed itemized inventory and Jefferson County policies mandate that the searching officer fill out the form. CP at 269. The trial court found that, "With regard to any irregularities in the completion of the inventory record form, it is not realistic to think that in the early morning hours an officer is going to pick through a car item by item and write it out on the form." CP at 268.

3

Once the vehicle arrived at the impound lot, Anderson applied for and received a search warrant. Anderson searched the vehicle and found in the backpack two baggies containing a total of more than 40 grams of methamphetamine and one baggie containing heroin. Also in the vehicle, officers found checkbooks with various people's names on them and three cell phones.

III.    CRIMINAL CHARGES

The State charged Hartzell with one count of attempting to elude a pursuing police vehicle, one count of hit and run property damage, one count of driving with a suspended or revoked license, two counts of possession of a controlled substance with intent to manufacture or deliver, one each for heroin and methamphetamine, and four counts of unlawful possession of payment instruments.

Hartzell moved to suppress all evidence seized from the backpack. He argued that the inventory search had been a purely pretextual investigatory search for evidence at the scene of the crash. The court denied this motion after an evidentiary hearing, concluding that the officers performed a proper inventory search and the drugs were in plain view.

At trial, Hartzell called Gabrhea Caudill, who had provided him with chemical dependency treatment. About a month before trial, Caudill had assessed Hartzell for a substance use disorder and determined that he had severe methamphetamine use disorder, severe opiate use disorder, and alcohol use disorder.

On cross-examination, the prosecutor asked Caudill, "did Mr. Hartzell break down and cry like this when you saw him at the jail and did your interview? Or was he just able to sit and answer your questions?" 4 RP at 760-61. Hartzell objected on relevance grounds and the trial court overruled the objection. Caudill testified that "[t]here was one point where he did cry while he was talking about somebody holding a gun to his head at a river in Mexico." 4 RP at 761.

4

The prosecutor also asked Caudill whether, in reviewing Hartzell's criminal history, she saw "any arrests for drug dealing or drug use." 4 RP at 767. Hartzell objected and the trial court sustained the objection. The prosecutor then asked whether Hartzell told Caudill "that he had arrests, or something about drug use in his history." 4 RP at 767. The trial court again sustained an objection and told the prosecutor, "We're not going there." 4 RP at 767.

Later in the cross-examination, the prosecutor, referring to Caudill's report, commented, "I thought I read something in here about a drug cartel, so I'm going to look for that." 4 RP at 775. Hartzell objected on grounds of improper impeachment and the court declined to rule until the prosecutor asked a question. The prosecutor then questioned Caudill about an event where Hartzell "was blown up by a grenade or got hit with shrapnel from a grenade" in Mexico. 4 RP at 776-77.

Hartzell objected, arguing the line of questioning was irrelevant and improper impeachment, and that the State was attempting to introduce impermissible ER 404(b) evidence through Caudill's evaluation. The parties argued over the objection in front of the jury. The prosecutor said she was "just attempting to impeach the defendant's credibility on what he told [Caudill] and the basis for her opinion. And these are things he told her." 4 RP at 777. The prosecutor agreed that ER 404(b) still applied and the court said, "So don't go there. So the objection's overruled so far. I haven't heard anything that—that's a problem." 4 RP at 778.

The prosecutor then asked Caudill whether Hartzell "attribute[d] what happened to him as being based on his involvement in drugs" and Caudill answered, "Yes. And I—I believe that's" before being cut off by another defense objection. 4 RP at 778. The court sustained the objection and then said, outside the presence of the jury:

I want to make this very simple. 404(b) applies to this defendant. And also there's only certain types of prior convictions and so forth that can be used to impeach the defendant if he testifies. You cannot bring up through her a bunch of prior bad acts. And I'm not going to allow that to happen. I don't a mistrial [sic]. I don't need a bunch of mistakes. And the State doesn't either.

So I—quite frankly, I'm not sure what you're thinking or what road you're going down, okay? You've made a number of points already about, oh, this is totally based on his statements and his reporting, and all that. I don't know how far you feel like you need to go with impeaching this evaluation.

So is there any confusion now about what can be asked and what cannot be? There's a lot of other stuff in there I'm sure that can be asked unrelated to prior criminal behavior, or alleged criminal behavior, or "alleged bad acts." And as far as I'm concerned that's not going to come in and it can't come in.

4 RP at 778-79. The prosecutor said she understood the ruling, but that she wished to "get to the underpinnings" of Caudill's opinions about Hartzell's drug history and treatment and "how drugs ha[d] messed up his life." 4 RP at 779. She argued that Hartzell's drug history was "the only thing that supports what [Caudill was] saying." 4 RP at 779. The prosecutor contended the evidence was relevant because Hartzell had not been arrested or charged in previous drug cases, suggesting that his statements to Caudill about drug problems were false.

Hartzell moved for a mistrial, arguing that the prosecutor's actions were inappropriate based on her questions "about the cartel in Mexico and a grenade" which were highly prejudicial. 4 RP at 781. The court told the prosecutor there was "no reason why and no basis" to "bring up [Hartzell's] criminal history and prior bad acts." 4 RP at 782. It forbade the prosecutor from continuing the line of questioning, but denied the motion for a mistrial. The court offered to provide a jury instruction but did not "detect anything that needed to be corrected" and did not do so. 4 RP at 784.

The jury found Hartzell guilty of attempting to elude police, hit and run property damage, possession of methamphetamine, possession of heroin with intent to deliver, and two counts of unlawful possession of payment instruments.

6

Hartzell's sentence included a $200 criminal filing fee and a $100 DNA (Deoxyribonucleic acid) collection fee, both of which the trial court concluded were mandatory. Hartzell appeals his convictions.

## ANALYSIS

I.    IMPOUND OF VEHICLE

Hartzell contends that the trial court erred by denying his motion to suppress because the deputies lacked authority to impound his vehicle. He contends that, because the officers in this case did not consider any alternatives to impoundment, it was unlawful and items discovered in the inventory search must be suppressed. Hartzell did not raise this issue in his suppression motion before the trial court. Because no reasonable alternatives existed in this case, we disagree with Hartzell.

RAP 2.5(a) permits us to "refuse to review any claim of error which was not raised in the trial court." However, an appellant may "raise for the first time a 'manifest error affecting a constitutional right.'" *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d 233 (2015) (quoting RAP 2.5(a)).

A manifest error affecting a constitutional right must be "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988). "The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected" his rights, and "the facts necessary to adjudicate the claimed error must be in the record on appeal." *State v. Torres*, 198 Wn. App. 864, 877, 397 P.3d 900 (2017). We often review the merits of a constitutional claim to determine whether the defendant can show a manifest error affecting a constitutional right. *See State v. Kirwin*, 165 Wn.2d 818, 823-24, 203 P.3d 1044 (2009). We do so here.

"When reviewing a suppression order, we determine whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law." *State v. Froehlich*, 197 Wn. App. 831, 837, 391 P.3d 559 (2017). Unchallenged findings of fact are verities on appeal. *Froehlich*, 197 Wn. App. at 837. We review the trial court's conclusions of law de novo. *Froehlich*, 197 Wn. App. at 837.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit warrantless searches unless an exception to the warrant requirement applies. *Froehlich*, 197 Wn. App. at 837. One of these exceptions is for inventory searches of impounded vehicles. *State v. Tyler*, 177 Wn.2d 690, 700-01, 302 P.3d 165 (2013). "A noninvestigatory inventory search of a vehicle may be conducted in good faith after it is lawfully impounded." *Tyler*, 177 Wn.2d at 701.

The police may impound a vehicle if it is evidence of a crime, under the community caretaking function, or pursuant to a statute. *Tyler*, 177 Wn.2d at 698. "[E]ven when authorized by statute 'impoundment must nonetheless be reasonable under the circumstances to comport with constitutional guaranties.'" *Tyler*, 177 Wn.2d at 699 (quoting *State v. Hill*, 68 Wn. App. 300, 305, 842 P.2d 996 (1993)). "'[I]mpoundment is inappropriate when reasonable alternatives exist.'" *Tyler*, 177 Wn.2d at 699 (quoting *Hill*, 68 Wn. App. at 306). "The police officer does not have to exhaust all possible alternatives, but must consider reasonable alternatives." *Tyler*, 177 Wn.2d at 699. "Whether an impoundment is reasonable depends on the facts of each case." *Froehlich*, 197 Wn. App. at 838. "[F]acts subsequent to impoundment do not bear on whether the impoundment was reasonable." *Tyler*, 177 Wn.2d at 699.

Hartzell does not contest that the deputies had statutory authority to impound his vehicle; rather he alleges that they failed to exhaust reasonable alternatives to impound, such as contacting

the vehicle's registered owner or asking Hartzell what he wanted done with it. Neither of these alternatives was reasonable in this case.

Hartzell crashed into a tree on private property shortly after 10:00 p.m. No one else was in the vehicle and the crash rendered it inoperable. It took the deputies one to two additional hours after the crash to remove the tree and get a tow driver to remove the vehicle and they did not finish dealing with the vehicle until after midnight. The deputies never considered any alternatives to impounding Hartzell's vehicle. Hartzell did not own the vehicle and the deputies did not attempt to contact the vehicle's registered owner.

Although officers need not "exhaust all possible alternatives," they "must consider reasonable alternatives." *Tyler*, 177 Wn.2d at 699. Although *Tyler* stated this principle in broad terms, the facts in *Tyler* are distinguishable. In *Tyler*, the vehicle could be driven and contained another occupant whom the officer did not arrest. 177 Wn.2d at 695. Because the occupant lacked a valid driver's license, the officer allowed him to use a cell phone to find another driver to come take the vehicle, but he was unable to do so. *Tyler*, 177 Wn.2d at 695.

Hartzell did not own the vehicle, it was not drivable, it had to be removed from a tree which first had to be cut, it was on private property, and the crash took place late at night when it would have been difficult to reach the registered owner. In addition, no passengers were present who might have been able to take the vehicle, Hartzell had fled the scene, and officers were searching for him while Peterson dealt with extracting the vehicle from the tree. The trial court did not have the opportunity to consider whether reasonable alternatives existed because Hartzell did not make this argument before the trial court.

Although the deputies did not consider any alternatives to impound in this case, they must do so only if reasonable alternatives existed. Their decision to impound the vehicle without considering other alternatives was reasonable given the circumstances in this case. Accordingly, Hartzell has not shown a manifest error affecting his constitutional rights.

II.     INVENTORY SEARCH

Hartzell contends that the inventory search violated department policies and procedures. He claims that the inventory search was purely pretextual and the trial court erred by denying his motion to suppress the evidence seized as a result.[3] We disagree.

"Inventory searches have long been recognized as a practical necessity. A noninvestigatory inventory search of a vehicle may be conducted in good faith after it is lawfully impounded." *Tyler*, 177 Wn.2d at 700-01 (internal citations omitted). Such inventory searches must be conducted in good faith to preclude searches as a pretext for an investigatory search. *Tyler*, 177 Wn.2d at 701.

"Warrantless inventory searches are permissible because they (1) protect the vehicle owner's (or occupants') property, (2) protect law enforcement agencies/officers and temporary storage bailees from false claims of theft, and (3) protect police officers and the public from potential danger." *Tyler*, 177 Wn.2d at 701. The "direction and extent of [inventory] searches must be restricted to effectuating the purposes which justify their exceptions to the Fourth Amendment." *State v. Houser*, 95 Wn.2d 143, 154, 622 P.2d 1218 (1980). "Not every inventory taken in compliance with police department regulations is lawful and where a search is improper

---

[3] Hartzell also contends that the plain view exception to the warrant requirement does not apply because "the deputies were not lawfully conducting an inventory search" so they had "no valid justification for being in the car and moving the backpack." Br. of Appellant at 19. Because Hartzell's plain view argument is entirely dependent on whether the deputies conducted a lawful inventory search, we address only that issue.

it cannot be legitimatized by conducting it pursuant to standard police procedure." *Houser*, 95 Wn.2d at 154.

Where officers merely "pull[] an inventory search of [a] vehicle for personal property" and neither make a "complete list of other items in the vehicle" nor do they continue searching after finding incriminating evidence, their search "cannot fairly be characterized as an inventory search." *State v. Gluck*, 83 Wn.2d 424, 429, 518 P.2d 703 (1974).

The inventory search in this case lasted less than one minute. As soon as the deputies noticed the methamphetamine in the open backpack pocket, they stopped searching, shut the car door, and "determined that to do anything else they needed to get a warrant." CP at 268. The deputies never created an "itemized-detailed inventory" at any point before or after their inventory search, or the later warrant search. CP at 269. Both deputies "admitted under oath that [Jefferson County Sheriff's Office] policies with respect to inventory searches were not followed." CP at 269.

The deputies' actions in this case are consistent with a lawful inventory search that rapidly became investigatory when they discovered incriminating evidence. Upon finding drugs in the vehicle, items of evidentiary value, they immediately stopped their inventory search and sealed the vehicle to get a warrant. Given that the discovery of this evidence transformed their motive from inventory to investigation, the deputies followed proper protocol when they discovered the drugs.

The officers did not comply with inventory procedures, and they included minimal information about the vehicle's contents and damaged condition on the inventory form, suggesting that their search did not effectuate the purposes of a lawful inventory search under *Tyler*. However, the deputies only stopped their search when they found contraband; if they had not done so, there is no reason to believe they would not have finished the inventory search and completed the form.

Absent evidence in the record that their search was pretextual, we conclude that the deputies followed proper procedure in this case and the inventory search was lawful.

III.     PROSECUTORIAL MISCONDUCT

Hartzell contends that the prosecutor committed misconduct by asking Caudill repeated questions about Hartzell's criminal history despite sustained objections. He contends that, in light of the misconduct, the trial court erred by denying his motion for a mistrial. We agree.

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's misconduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 759-60, 278 P.3d 653 (2012). "'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" *State v. Thorgerson*, 172 Wn.2d 438, 460, 258 P.3d 43 (2011) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)).

Where a defendant objects or moves for a mistrial on the basis of prosecutorial misconduct at trial, the inquiry consists of two prongs: "(1) whether the prosecutor's comments were improper and (2) if so, whether the improper comments caused prejudice." *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). A trial court's denial of a motion for a mistrial is reviewed for abuse of discretion. *State v. Roberts*, 142 Wn.2d 471, 533, 14 P.3d 713 (2000). A trial court "should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996).

Evidence of gang affiliation is generally not admissible in criminal trials when it merely reflects a person's beliefs or associations. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). Such evidence is considered prejudicial and its admission is measured under the standards of ER 404(b). *Scott*, 151 Wn. App. at 526.

In this case, while the prosecutor cross-examined Caudill, she commented that she "read something in [Caudill's report] about a drug cartel" and then asked questions about Hartzell being "blown up by a grenade" in Mexico. 4 RP at 775-77. The court overruled an objection to this testimony, but then sustained an objection to a follow-up question about whether Hartzell attributed the grenade incident to his involvement with drugs. The court then denied a defense motion for a mistrial.

The prosecutor did not actually present evidence of Hartzell's affiliation or connection with a drug cartel. However, she commented in front of the jury that Caudill's report referenced a cartel and then questioned Caudill about Hartzell's experience of being exploded by a grenade in Mexico in connection with his drug involvement. This comment and line of questioning referenced inadmissible and inherently prejudicial information about Caudill's affiliation with drug cartels. The prosecutor's statement and line of questioning were improper.

The prejudicial information was "of a nature likely to 'impress itself upon the minds of the jurors.'" *State v. Escalona*, 49 Wn. App. 251, 256, 742 P.2d 190 (1987) (quoting *State v. Miles*, 73 Wn.2d 67, 71, 436 P.2d 198 (1968)). It would likewise be "extremely difficult, if not impossible" for the jury to ignore the seemingly relevant facts. *Escalona*, 49 Wn. App. at 256. In *Escalona*, the trial court specifically instructed the jury to disregard the prejudicial information, but the instruction was unable to remove the prejudice due to the inherently prejudicial nature of evidence of the defendant's prior criminal conduct. 49 Wn. App. at 255.

13

In this case, the trial court did not specifically instruct the jury to disregard; rather the State contends that the generic instruction to disregard evidence ruled inadmissible sufficiently cures any prejudice. This part of the standard instruction stated:

> One of my duties has been to rule on the admissibility of evidence. Do not be concerned during your deliberations about the reasons for my rulings on the evidence. If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict. Do not speculate whether the evidence would have favored one party or the other.

CP at 97. This generic instruction to disregard evidence ruled inadmissible does not cure inherently prejudicial information about Hartzell's involvement with a drug cartel.

In evaluating prejudice, we also consider the relative strength of the State's case. *Escalona*, 49 Wn. App. at 256. Other than quantity of drugs, the State presented little evidence of Hartzell's intent to distribute heroin. Police found multiple cell phones, which was consistent with dealing drugs, but there were no scales, packaging, cash, or other drug dealing paraphernalia in the vehicle. The State also presented evidence of communications in which Hartzell stated people owed him money and about a trip to Tacoma, which is a common source of drugs that make their way to Jefferson County. The State's lack of evidence of intent to distribute in this case intensifies the prejudicial impact of the misconduct.

The trial court abused its discretion by denying Hartzell's mistrial motion in this case. The prosecutor improperly brought up a drug cartel and then immediately asked a witness questions

14

about Hartzell's experiences being "blown up by a grenade" in Mexico, tied to his involvement with drugs. 4 RP at 776. The prosecutor did not adequately explain this information's relevance except as showing a propensity to commit drug crimes and an association with drug cartels. We reverse Hartzell's conviction for possession of heroin with intent to distribute.[4]

## IV.   LEGAL FINANCIAL OBLIGATIONS

Hartzell contends that legislative changes to Washington's LFO system since his sentencing require this court to reverse LFO portions of his sentence. Because we reverse one of Hartzell's convictions, the trial court must conduct a new sentencing hearing. On remand, the trial court should consider Hartzell's LFOs in light of the 2018 amendments to the LFO provisions, LAWS OF 2018, ch. 269, and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

## V.   STATEMENT OF ADDITIONAL GROUNDS (SAG)

In his SAG, Hartzell alleges that the deputies unlawfully impounded his vehicle without considering reasonable alternatives and that their inventory search was pretext for an unlawful investigatory search.[5] Where a SAG contains errors that "have been thoroughly addressed by counsel," they are "not proper matters for [the] statement of additional grounds under RAP 10.10(a)." *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012). We therefore do not address these arguments.

---

[4] Hartzell does not contend that the misconduct necessitates reversal of any of his other five convictions.

[5] Hartzell also asserts the deputies inappropriately handled the backpack by manipulating it. The record does not support this assertion.

CONCLUSION

We reverse Hartzell's conviction for possession of heroin with intent to deliver due to prosecutorial misconduct and affirm his other convictions and remand to the superior court for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Sutton, J.

16